## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **DYSON, INC.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 10 C 8126** |
| | ) | |
| **BISSELL HOMECARE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

SAMUEL DER-YEGHIAYAN, District Judge

This matter is before the court on Plaintiff Dyson, Inc.'s (Dyson) motion for partial summary judgment. This matter is also before the court on Defendant Bissell Homecare, Inc.'s (Bissell) motion to exclude the expert report of Ran Kivetz (Kivetz), Bissell's motion to disqualify Susan Goldsmith (Goldsmith) from serving as an expert, and Bissell's motion for summary judgment. For the reasons stated below, Dyson's partial motion for summary judgment is granted in its entirety and Bissell's motions are denied in their entirety.

## BACKGROUND

Bissell allegedly indicates in its advertising that consumers can improve their respiratory health by using a Bissell vacuum cleaner. Bissell allegedly touts the

1

specific air filtration performance of eleven different models of Bissell vacuum cleaners (Bissell Vacuum Cleaners) on its website, product packaging, and the products themselves. Dyson alleges that through such advertising, Bissell has deceived consumers into buying less-expensive Bissell Vacuum Cleaners by falsely assuring consumers that the Bissell Vacuum Cleaners will provide the same air filtration performance as Dyson's more-expensive vacuum cleaners (Dyson Vacuum Cleaners). Dyson filed the instant action challenging certain advertising claims made by Bissell with respect to the Bissell Vacuum Cleaners.

The following models at issue in this case (collectively referred to as "OS Vacuum Cleaners") are open-system vacuum cleaners, meaning that the vacuum cleaners are not sealed, and have some leakage of air in gaps and seams in the products: CleanView Helix (Model Series #82H1), Rewind SmartClean (Model Series #58F8, 18M9-P), Lift-Off MultiCyclonic Pet (Model Series #89Q9), Pet Hair Eraser (Model Series #3920), Momentum (Model Series #82G71), PurePro Multi Cyclonic (Model Series #59G9), DigiPro Canister (Model Series #6900), Pet Hair Eraser Canister (Model Series #66T6), Pet Hair Eraser Corded Hand Vacuum (Model Series #33A1-B), and CleanView Deluxe Corded Hand Vacuum (Model Series #47R5/47R5-1). Dyson's claims in this case also relate to Bissell's Healthy Home (Model Series 16N5) vacuum cleaner, which is a closed-system vacuum cleaner, meaning that the unit itself is sealed, allowing no air to escape from the gaps and seams in the product.

In 2010, Bissell allegedly stated on its website, on product packaging, and on

2

certain OS Vacuum Cleaners themselves that the OS Vacuum Cleaners had a "HEPA Media Filter," and that the filters or vacuum cleaners "capture[d] over 99.9%" of certain allergens (collectively referred to as "2010 Statements"). (DSF Par. 24, 25). Dyson asserts that "High Efficiency Particulate Air," commonly referred to as "HEPA," is the term used in the United States to indicate that a filter or filtration system traps 99.97% of dust and other particles that are 0.3 microns[1] in size. Dyson contends that the 2010 Statements are false because the OS Vacuum Cleaners do not meet HEPA standards or capture more than 99.9% of allergens. With respect to the Healthy Home vacuum cleaner, Dyson alleges that Bissell falsely represented to consumers that the Healthy Home vacuum cleaner was "airtight" and that it captured 100% of certain allergens.

Before initiating the instant action, Dyson allegedly commissioned independent testing of the Bissell Vacuum Cleaners using industry standard tests (Testing). Dyson contends that the Testing shows that the filtration performance of the OS Vacuum Cleaners does not come close to HEPA level, and that the allergen capture performance of the OS Vacuum Cleaners does not come close to the 99.9% figure that Bissell claims in its advertising. The Testing also allegedly reveals that the filters used in the OS Vacuum Cleaners do not even themselves meet HEPA

---

[1] The word micron, which is derived from the ancient Greek work μικρος meaning short (opposite of μακρος - long), is commonly used to refer to the unit of measurement of a micrometer and is identified by the symbol μ or μm. The length of one micron or micrometer is one-millionth of a meter, or one-thousandth of a millimeter (approximately 0.000039 inches). *See* "micron," *Wikipedia*, http://en.wikipedia.org/wiki/Micron (last visited May 24, 213); Raymond V. Schoder, S.J. and Vincent C. Horrigan, S.J. *A Reading Course in Homeric Greek*, 327 (2nd. Ed. 2007); Gavin Betts and Alan Henry, *Complete Ancient Greek*, 416 (2010).

standards or fulfill the 99.9% capture claims advertised by Bissell. In addition, the Testing allegedly reveals that the Healthy Home vacuum cleaner is not airtight, and that its performance is also below HEPA level.

Dyson contends that after it sued Bissell in the instant action, Bissell amended the 2010 Statements to try to rectify the inaccuracies in the 2010 Statements. Beginning in January 2011, after the instant action was initiated, Bissell allegedly provided new statements regarding the OS Vacuum Cleaners (2011 Statements). The 2011 Statements allegedly included a disclaimer, indicating that only the filter, and not the vacuum cleaner as a whole, met HEPA standards (2011 Disclaimer). (DSF Par. 28). In 2012, Bissell allegedly altered the 2011 Statements on the OS Vacuum Cleaners and again revised the graphics on certain packaging. (DSF Par. 31).

Dyson alleges that its founder and principal inventor spent years developing a bagless vacuum that could separate dust and debris from incoming air flow while maintaining a constant, high level of suction throughout the vacuum's life. As a result of their unique designs and superior filters, the air filtration performance of Dyson Vacuum Cleaners is allegedly far superior to the air filtration performance of Bissell Vacuum Cleaners. In addition, Dyson Vacuum Cleaners are allegedly certified as asthma and allergy friendly by the Asthma and Allergy Foundation of America (AAFA), whereas no model of Bissell's vacuum cleaners has ever been certified by the AAFA.

Dyson contends that Bissell knows the importance that modern consumers place on products that promote health, and that Bissell knows that its advertising claims relating to Bissell Vacuum Cleaners are false. Dyson also alleges that Bissell's advertising claims are especially harmful to consumers because consumers have no way to independently determine whether they are truthful. Consumers have allegedly relied on, and will allegedly continue to rely on, Bissell's allegedly false advertising claims when determining which vacuum to purchase. As a result, in addition to the alleged harm to the respiratory health of consumers caused by Bissell's alleged deception, Bissell's allegedly false advertising claims have allegedly financially harmed Dyson, as Bissell's direct competitor.

Dyson includes in its complaint a false or deceptive advertising claim brought pursuant to the Lanham Act, 15 U.S.C. § 1051 *et seq.* (Count I), a claim brought pursuant to the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* (Count II), a claim brought pursuant to the Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS 505/1 *et seq.* (Count III), and a common law unfair competition claim (Count IV). Bissell answered the complaint and included as affirmative defenses: failure to state a claim, laches, statute of limitations, acquiescence, estoppel, release, and unclean hands. Dyson now moves for partial summary judgment on the 2010 Statements and Bissell's affirmative defenses of failure to state a claim, laches, statute of limitations, acquiescence, estoppel, and release. Bissell now moves for summary judgment on all claims and the affirmative defenses of release and laches. Bissell also moves to exclude the

5

expert report of Kivetz and to disqualify Goldsmith from serving as an expert in this case.

## LEGAL STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, reveals that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Smith v. Hope School*, 560 F.3d 694, 699 (7th Cir. 2009). A "genuine issue" of material fact in the context of a motion for summary judgment is not simply a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). In ruling on a motion for summary judgment, the court must consider the record as a whole, in the light most favorable to the non-moving party, and draw all reasonable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Bay v. Cassens Transport Co.*, 212 F.3d 969, 972 (7th Cir. 2000). When there are cross motions for summary judgment, the court should "construe the evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

**DISCUSSION**

I.  Motion to Exclude the Expert Report of Kivetz

Bissell argues that the court should exclude the expert report of Kivetz.  As the proponent of Kivetz's expert report, Dyson bears the burden of establishing that it is admissible.  *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). An expert's testimony is admissible only if it meets the requirements of Federal Rule of Evidence 702 (Rule 702) and the factors set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *See Lees v. Carthage College*, 2013 WL 1590038, at *4 (7th Cir. 2013)(discussing the court's "special gatekeeping obligation" under Rule 702 and *Daubert* to "ensure that [expert] evidence is relevant and reliable before admitting it").  Pursuant to Rule 702 and *Daubert*, "[f]irst, the expert must be qualified by knowledge, skill, experience, training, or education; second, the proposed expert testimony must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and methods to the facts of the case."  *Id*. In addition, "the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors."  *Id.* (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

Kivetz's expert report relates to a consumer survey (Survey) that Kivetz conducted regarding certain advertising claims made on the packaging of Bissell's

CleanView Helix vacuum cleaner (CleanView Packaging). The Seventh Circuit has indicated that in order to be admissible, a consumer survey "must comply with the principles of professional survey research." *Evory v. RJM Acquisitions Funding L.L.C.*, 505 F.3d 769, 776 (7th Cir. 2007); *see also Muha v. Encore Receivable Management, Inc.*, 558 F.3d 623, 625-26 (7th Cir. 2009) (recognizing that whether a consumer survey should be admitted "depends among other things on 'whether the questions are leading or suggestive'")(citations omitted); *Spraying Systems Co. v. Delavan, Inc.*, 975 F.2d 387, 396 (7th Cir. 1992)(indicating that to be admissible, a survey must "replicate market conditions" and be free of bias). The Seventh Circuit has also cited with approval precedent from the Second Circuit, the Third Circuit, the Fifth Circuit, and the Southern District of New York in recent cases in which the admissibility of a consumer survey was at issue. *See e.g., Muha,* 558 F.3d at 625-26; *see also, e.g., Evory*, 505 F.3d at 776. When considering whether to admit a consumer survey, courts in those circuits focus on such factors as "whether (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and nonleading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured." *Schering Corp. v. Pfizer Inc.* 189 F.3d 218, 225 (2d Cir. 1999); *Weight Watchers Intern., Inc. v. Stouffer Corp.*, 744 F.Supp. 1259, 1272

8

(S.D.N.Y. 1990)(listing factors relevant to determining admissibility of a consumer survey). In addition, the Seventh Circuit has indicated with respect to consumer surveys that "[w]hile there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, . . . such situations will be rare," and that generally, "any shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993).

In this case, the Survey designed by Kivetz was used to examine the effect of certain advertising claims that Bissell makes on the CleanView Packaging (CleanView Claims), which the court notes are representative of all of the advertising claims at issue in this case. The CleanView Claims are located on four panels of the CleanView Packaging and state: "HEPA Media Filter* - The filter captures 99.9% of pollens and ragweed from the air passing through it." (Kivetz Rep. Par. 12). The CleanView Packaging also includes the 2011 Disclaimer on the lower left corner of the back panel, which states: "*The filter media, not the vacuum as a whole, complies with the High Efficiency Particulate Air (HEPA) filter specification (EN 1822-1-2009)." (Kivetz Rep. Par. 12).

A total of 407 consumers participated in the Survey (Participants), with approximately half being assigned to a test group (Test Group) and approximately half being assigned to a control group (Control Group). (Kivetz Rep. 13). The Test Group viewed the CleanView Packaging with the CleanView Claims and the 2011 Disclaimer, while the Control Group viewed a modified version of the packaging

9

(Modified Packaging).  The revisions to the Modified Packaging included a modified disclaimer (Modified Disclaimer), located directly below the CleanView Claims, which stated: "*The vacuum during operation does **not** meet the HEPA filter specifications."  (Kivetz Rep. Par. 30, 38); (Kivetz Rep. Ex G).  While viewing either the CleanView Packaging or the Modified Packaging, Participants were asked several questions (Survey Questions) regarding what, if anything, was being communicated to them about the HEPA Media Filter and about the vacuum cleaner as a whole.  (Kivetz Rep. Ex. F).

Neither the interviewers, their supervisors, or the Participants were aware of the purpose of the Survey.  (Kivetz Rep. Par. 21).  After the Survey, the responses of the Participants (Survey Responses) were coded by an independent coder (Coder) who was similarly unaware of the parties or objectives of the Survey.  (Kivetz Dep. 22).  After reviewing the coded data, Kivetz concluded that the CleanView Claims caused a "27% net deception level," and that "there is a meaningful and significant likelihood that the [CleanView Packaging] causes consumers to believe that the vacuum cleaner during operation provides the air filtration performance claimed on its package."  (Kivetz Rep. Par. 54).  Kivetz also concluded that the 2011 Disclaimer "is ineffective at communicating to consumers that the vacuum during operation does not meet HEPA filter specifications."  (Kivetz Rep. Par. 52, 55)(emphasis in original).  Bissell now challenges the admissibility of Kivetz's expert report, contending that the Survey Questions were problematic, that the coding of the Survey Responses was subjective, and that the methodology of the Survey was flawed.

10

A.  Survey Questions

Bissell argues that the Survey Questions did not address the relevant issue and that they were based on undefined terminology.  During the Survey, Participants were first asked "what message or messages, if any, does this package mainly communicate to you about this product?" (Question 1a), and Participants were then asked "Anything else?" (Question 1b).  (Kivetz Rep. Par. 32).  Participants' responses to Question 1a and Question 1b were recorded verbatim.  (Kivetz Rep. Par. 32).  Participants were next asked the filter question "Does or doesn't this package communicate to you anything about a HEPA Media Filter?" (Question 2).  (Kivetz Rep. Par. 33).  Participants were excused from the Survey if they indicated in the negative or indicated that they did not know.  (Kivetz Rep. Par. 34).  Participants who indicated in the affirmative were asked the follow-up question "What does this package communicate to you about a HEPA Media Filter?" (Question 3a), and then "What else, if anything, does this package communicate to you about a HEPA Media Filter?" (Question 3b).  (Kivetz Rep. Par. 34).  Participants' responses to Question 3a and 3b were also recorded verbatim.  Subsequently, Participants were asked the additional filter question:

"Do you think that:

> This package <u>does</u> communicate to you <u>whether</u> the vacuum provides HEPA level performance during operation

> This package <u>does not</u> communicate to you <u>whether</u> the vacuum provides HEPA level performance during operation, or

> Do you not know?"

11

(Question 4). (Kivetz Rep. Par. 35). If a Participant selected "This package <u>does</u> communicate to you <u>whether</u> the vacuum provides HEPA level performance during operation," the Participant was asked the follow-up questions "What does this package communicate to you about <u>whether</u> the vacuum provides HEPA level performance during operation?" (Question 5a), and "What else, if anything, does this package communicate to you about <u>whether</u> the vacuum provides HEPA level performance during operation?" (Question 5b). Participants' responses to Questions 5a and 5b were also recorded verbatim.

Bissell argues that Questions 4, 5a, and 5b did not address the relevant question: whether Participants believed that the CleanView Claims related to the vacuum cleaner as a whole or merely to the filter. Instead, according to Bissell, the Survey Questions caused Participants to erroneously draw the distinction "between the vacuum during operation and the vacuum when not in operation." (Mot. Disqu. K 8). To support its position, Bissell points to a handful of Survey Responses given by Participants indicating that those Participants believed the CleanView Claims to communicate that HEPA level performance could only be achieved if the vacuum was running. (Mot. Disqu. K 9). However, presenting the court with a handful of responses that indicate possible confusion on the part of a few Participants does not sufficiently demonstrate that the Survey Questions failed to address the relevant issue. Confusion on the part of a few Participants is the unavoidable, albeit undesirable, by-product of asking Participants open-ended, non-leading questions during a Survey. The fact that a handful of Participants placed some emphasis on the words "during operation" does not demonstrate a fundamental problem with

12

Questions 4, 5a and 5b, especially given the context in which they were asked.

Bissell complains that the questions posed "do not allude to the possibility that filtration performance claims might be based on filter-only testing," (Mot. Disqu. K 9). Such a complaint, in essence, sounds like an objection to Kivetz's failure to use leading questions to suggest the response desired by Bissell. Moreover, Bissell's complaint ignores the progression of the Survey Questions, which began as completely broad, then focused on the filter alone, and then finally addressed whether the CleanView Claims communicated anything regarding the filtration benefits of the vacuum cleaner as a whole.

Bissell also objects to Kivetz's use of the term "HEPA level performance" in Questions 4, 5a and 5b of the Survey. Bissell contends that "HEPA level performance" is an undefined term, that HEPA standards differ depending on what is being tested or described, and that the term "HEPA level performance" does not equate to the allergen capture claims made on the CleanView Packaging. Bissell therefore reasons that using the term "HEPA level performance" as a proxy for the CleanView Claims was improper. However, the purpose of the Survey was not to test consumers' understanding of the phrase "HEPA level performance" or the falsity of Bissell's advertising claims with respect to whether the vacuum cleaner or the filter actually achieved HEPA level performance. Rather, the purpose of the Survey was to test Participants' understanding regarding whether the CleanView Claims communicated something about the filter alone or about the vacuum cleaner as a whole. Given such a purpose, the precise definition of "HEPA level performance" is not relevant to the Survey. In the context of the Survey, the term "HEPA level

performance" is close enough in meaning to the CleanView Claims to serve as an appropriate proxy. It is not fatal to the Survey that Participants did not have a precise definition of the term "HEPA level performance" when responding to Questions 4, 5a, and 5b, especially given that Bissell has not pointed to any evidence suggesting that Participants did not understand the term "HEPA level performance" to be a proxy for the CleanView Claims. In the context of the Survey, the use of the term "HEPA level performance" was proper. In addition, as mentioned above, the purpose of the Survey was not to have Participants establish the meaning of the term "HEPA level filter," but rather to determine whether consumers thought the CleanView Claims applied to the vacuum cleaner as a whole or solely to the filter. (Kivetz Dep. 367-368); (Kivetz Rep. Par. 11). Thus, the case cited by Bissell, *Mead Johnson & Co. v. Abbott Laboratories*, 201 F.3d 883 (7th Cir. 2000), is inapposite. *See id.* at 887 (holding that the district court committed legal error "[b]y using [a] survey to define the meaning of [a] phrase . . . and then insisting that verification meet the standards thus established"). Based on the above, the Survey Questions do not warrant exclusion of the Survey.

## B.  Coding

Bissell argues that the Survey Responses were subjectively coded to change the meaning of the answers given. In support of its argument, Bissell contends that most of the Survey Responses indicated neutrality or uncertainty regarding whether Participants believed the vacuum provided HEPA level performance during operation. As noted above, the verbatim responses to Questions 1a, 1b, 3a, 3b, 5a,

14

and 5b were coded by an independent Coder who did not know the purpose of the Survey. (Kivetz Rep. Par. 43); (Kivetz Dep. 22). The double-blind nature of the Survey significantly undercuts Bissell's suggestion that the Survey Responses were coded in a biased manner. Moreover, Bissell has not presented any legal authority supporting the proposition that survey responses must be coded in a completely objective manner, and certain case law in fact suggests otherwise. *See, e.g., Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 2010 WL 1334714, at *5 (N.D. Ill. 2010).

Bissell also argues that the coding was subjective because the Coder was not given relevant information about filtration standards, HEPA, and HEPA protocols. However, it is difficult to imagine how such information would be relevant to the Coder. As discussed above, the term "HEPA level filtration" was appropriately used as a proxy for the CleanView Claims that Participants were asked to evaluate. The Coder was not evaluating what definition consumers gave to the term "HEPA level performance," or whether the filters or the vacuums actually achieved HEPA level performance. The Coder was instead evaluating whether the statements of any given Participant indicated that the Participant believed that the CleanView Claims related to the filter only or to the vacuum cleaner as a whole. Therefore, the fact that the Coder was not given information regarding filtration standards, HEPA, and HEPA protocols does not support the conclusion that the coding was subjective.

Bissell also points to the fact that at the time Kivetz conducted the Survey, Kivetz did not know that the HEPA standard specifically referenced in the 2011 Disclaimer was a test protocol used for filter media standing alone. However, such

fact is not relevant, since Participants would likely also lack such knowledge.  Bissell also argues that because the allergen capture claims are not equal to any HEPA standard, it was improper to regard any of the "Captures 99.9%/99%" responses as suggesting that the vacuum provides "HEPA level performance."  However, again, in the context of the Survey, whether or not the filter or the vacuum actually achieves HEPA level performance under a certain test is not the relevant issue.  Instead, the relevant issue is whether Participants believed the CleanView Claims to communicate information relating to the filter or to the vacuum cleaner as a whole. As indicated above, the phrase "HEPA level performance" was merely used as a proxy for the CleanView Claims, including the claim that "the filter captures 99.9% of pollens and ragweed from the air passing through it."  (Kivetz Rep. Par. 12). Therefore, Bissell's argument is without merit.

Bissell also contends that certain Survey Responses were coded improperly, and provides several examples to support its contention.  However, considering the context in which Questions 5a and 5b were asked and the fact that Questions 5a and 5b solely related to the vacuum cleaner as a whole, it cannot be concluded that the Survey Responses highlighted by Bissell were coded improperly.  Further, even if the Survey Responses highlighted by Bissell were coded improperly, Bissell has not pointed to a sufficient number of improperly coded Survey Responses to demonstrate that the overall coding of the Survey was biased or overly subjective.  Based on the above, the coding of the Survey does not warrant the Survey's exclusion.

C.  Methodology

Bissell also argues that the methodology of the Survey violated accepted standards of survey research.  In support of its argument, Bissell contends that by merely presenting the CleanView Packaging or Modified Packaging to Participants, Kivetz did not properly replicate market conditions.  According to Bissell, to properly replicate market conditions, Kivetz should have presented multiple products, product packaging, and point of sale materials to Participants.  However, consumer confusion regarding the source of goods was not at issue in this case. Bissell has provided no case law indicating that to properly replicate market conditions in a case alleging false advertising, comparative products and literature must be made available.  Further, case law suggests that "standards for replicating market conditions for a consumer confusion survey in a trademark infringement case cannot be applied wholesale" to cases alleging false advertising.  *Rocky Brands, Inc. v. Red Wing Shoe Co., Inc*., 2009 WL 5125475, at *5 (S.D. Ohio 2009).

The Survey in this case was designed to test consumer perceptions regarding the CleanView Claims made on the CleanView Packaging.  To approximate market conditions, a mall-intercept survey was used.  (Kivetz Rep. Par. 16).  In addition, during the Survey, Participants were provided with an actual package of a vacuum cleaner and a price card, similar to what they would encounter in the marketplace. (Kivetz Rep. Par. 19).  Participants were instructed to examine the package "just as [they] would if [they] were at the store thinking of buying such a product."  (Kivetz. Rep. Par. 27).  Participants were also told to "take as much time as [they] would normally do when considering buying such a product," and to "feel free to pick up

the package if that is what [they] would normally do." (Kivetz Rep. Par. 27). In the context of a false advertising case, such methods sufficiently approximate market conditions.

Bissell also contends that Kivetz erroneously permitted Participants to continue to view the CleanView Packaging or Modified Packaging while they answered the Survey Questions, and Bissell points out that Kivetz criticized a survey in another case (Previous Survey) as unreliable for that very reason. However, Kivetz explained at his deposition that there were material distinctions between the Survey conducted in this case and the Previous Survey. (Kivetz 247-51). According to Kivetz, one of the most relevant distinctions between the two surveys is the category of the products being considered in each. (Kivetz Dep. 247, 249). Specifically, the Survey in this case relates to a vacuum cleaner, the purchase of which would likely involve deliberate and thoughtful decision-making by a consumer before its purchase because of its significant cost. (Kivetz Dep. 250). In contrast, the product at issue in the Previous Survey was a low-cost beverage, the purchase of which would not likely cause a consumer to engage in such an in-depth decision-making process. (Kivetz Dep. 250). Kivetz explained that in the context of a "relatively big item purchase," market conditions were better approximated when Participants were allowed to view the stimulus throughout the Survey, as opposed to having the stimulus removed. (Kivetz Dep. 250). Bissell has not shown that in order for the Survey to be valid, the packaging needed to be removed from the view of Participants during questioning. Kivetz's decision to allow Participants to view the CleanView Packaging or the Modified Packaging while responding to the Survey

Questions does not substantially undermine the methodology of the Survey, much less undermine it to such an extreme that the Survey should be excluded.

Bissell has not shown that any of the alleged problems with the Survey Questions, the coding, or the methodology are significant enough, even when considered in their totality, to warrant exclusion of the Survey. The problems identified by Bissell more appropriately go to the weight of the Survey than to its admissibility. In this case, Dyson has shown that the Survey is both "relevant and reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Therefore, Bissell's motion to exclude the expert report of Kivetz is denied.

## II. Motion to Disqualify Goldsmith

Bissell argues that Susan Goldsmith should be barred from testifying as an expert for Dyson in this case because she has a conflict of interest. A district court has the "inherent power to disqualify expert witnesses where or when it is necessary to protect the integrity of the adversary process, and/or to promote public confidence in the legal system." *Rosenthal Collins Group, LLC v. Trading Technologies Intern., Inc.*, 2008 WL 4542948, at *1 (N.D. Ill. 2008). Dyson opposes the instant motion, contending that there is no basis to exclude Goldsmith, that barring Goldsmith at this juncture would unfairly prejudice Dyson, and that Bissell's motion is untimely. The court notes that Goldsmith has also filed her own brief on this issue, arguing that the motion should be denied.

A.  Conflict of Interest

When a party seeks to disqualify a proposed expert based on a conflict of interest arising from the fact that the proposed expert has acquired confidential information from that party, the party must show: (1) that the party had a confidential relationship with the proposed expert, (2) that the proposed expert was exposed to confidential information that is relevant to the instant action, and (3) that there is a close relationship "between confidential information acquired and the matters to which the expert is expected to testify."  *Allstate Ins. Co. v. Electrolux Home Products, Inc.*, 840 F.Supp.2d 1072, 1078 (N.D. Ill. 2012); *Miller v. Lenz*, 2009 WL 3172151, at *2 (N.D. Ill. 2009); *Rosenthal Collins Group, LLC v. Trading Technologies Intern., Inc.*, 2008 WL 4542948, at *1 (N.D. Ill. 2008)(indicating that a court should "first asks whether the party seeking disqualification acted reasonably in assuming that a confidential relationship existed and, second, whether confidential information was exchanged requiring disqualification of the expert"); *Chamberlain Group, Inc. v. Interlogix, Inc.*, 2002 WL 653893, at *2 (N.D. Ill. 2002)(indicating that a court should consider "whether confidential information was exchanged requiring disqualification of the expert"); *see also Matthews v. Waukesha County*, 2012 WL 695669, at *9 (E.D. Wis. 2012)(stating that "neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has adopted a test for disqualification of an expert based on a purported conflict of interest"); *Miller*, 2009 WL 3172151, at *2 (stating that "[t]he standard for expert witness disqualification is not the same as attorney disqualification because experts are sources of information and opinions, and ideally are not advocates").  In addition, in determining whether to bar an expert,

20

the court must consider the equities and should keep in mind that the moving party bears a significant burden in showing that an expert should be excluded based on a conflict of interest. *See Winkler v. Eli Lilly & Co.*, 101 F.3d 1196, 1200 (7th Cir. 1996)(stating that "[u]nder the inherent powers doctrine, courts have the historic authority to grant such *equitable relief* as is necessary to protect the integrity of their judgments and the proceedings before them")(emphasis added); *Miller*, 2009 WL 3172151, at *2 (indicating that the court has an inherent power to ensure fairness in the proceedings when deciding whether to exclude an expert); *BP Amoco Chem. Co. v. Flint Hills Res.,* 500 F.Supp.2d 957, 960 (N.D. Ill. 2007)(stating that "[d]isqualification of an expert" based on a conflict of interest "is a 'drastic measure which courts should hesitate to impose except when absolutely necessary'")(quoting *Commonwealth Ins. Co. v. Stone Container,* 178 F.Supp.2d 938, 943 (N.D. Ill. 2001)).

Dyson indicates that it will present Goldsmith as a filtration expert who will give an expert opinion on matters such as the testing commissioned by Dyson in support of its claims in the instant action. Bissell contends that Goldsmith served as a confidential consultant for Bissell for more than ten years prior to the initiation of the instant action. Bissell further contends that in November 2011, before Dyson disclosed Goldsmith as an expert, Goldsmith entered into an agreement with Bissell to provide consulting services for Bissell relating to this case.

### 1. Confidential Relationship

Bissell contends that it formed a confidential relationship with Goldsmith prior

21

to the initiation of the instant action. Bissell contends that Goldsmith "has provided confidential consulting and testing services to" Bissell for more than ten years. (Reply Disqu. G 6). Bissell argues that "[b]ecause of Ms. Goldsmith's confidential relationships with BISSELL, it would be an impermissible conflict of interest for her to offer for-hire expert testimony adverse to BISSELL in this litigation." (Mot. Disqu. G. 2). However, the record reflects that Goldsmith's relationship with Bissell was far from an exclusive one. Dyson and Goldsmith have shown that Goldsmith performs services for the entire vacuum cleaner industry, including for direct competitors such as Dyson and Bissell. (Gold Decl. Par. 4-5). Dyson has shown that Goldsmith is one of the world's leading experts for vacuum cleaner testing and that there are few experts capable of performing the services that she is able to render. (Gold Decl. Par. 4-5). Dyson has also presented evidence showing that Goldsmith's company, Inter Basic Resources, Inc. (IBR), is one of the only, if not the only, independent accredited laboratory in the world that has both the expertise and the expensive, specialized test equipment required to run the filtration tests at issue in this litigation. (Gold Decl. Par. 4). Bissell itself acknowledges that "[n]umerous vacuum manufacturers - including BISSELL and Dyson - have regularly retained IBR to perform filtration testing and related services." (Mot. Disqu. G. 3).

The mere fact that Goldsmith performed work for Bissell previously and was exposed to confidential information as a result is not a sufficient basis to warrant disqualification. Such a conflict of interest standard would effectively prohibit leading experts, such as Goldsmith, from testifying as an expert in their field of expertise once they have been exposed to confidential information from one client.

Bissell cites no controlling precedent to support such a standard. It is also worth noting that it was Dyson that first hired Goldsmith to perform work relating to the instant action. In 2009, before Bissell hired Goldsmith in 2011 to perform work for Bissell relating to this case, Dyson had already hired Goldsmith to perform confidential work relating to this case.

### 2. Relevancy of Confidential Knowledge

Bissell argues that Goldsmith has been exposed to confidential information that is relevant to this case. Specifically, Bissell claims that during its "longstanding relationship with [] Goldsmith, . . . [Goldsmith] obtained substantial amounts of BISSELL confidential information that is directly relevant to the issues in this litigation." (Mot. Disqu. G. 2). Bissell asserts that Goldsmith has performed testing on some of the models at issue in this litigation. (Mot. Disqu. G. 4). Bissell also claims that Goldsmith "has personally toured BISSELL's facilities, including its internal testing laboratories." (Mot. Disqu. G. 5). Bissell also allegedly consulted Goldsmith concerning product development issues and the best methods to substantiate its advertising claims. In addition, Bissell contends that it hired Goldsmith in November 2011 to perform consulting services for Bissell relating to this case.

Dyson does not dispute that Goldsmith performed prior services for Bissell for more than ten years, and thus had a confidential relationship with Bissell relating to vacuum cleaner testing and advertising issues. (Ans. Mot. Disqu. G. 2). Goldsmith asserts that her only consulting work for Bissell relating to this litigation concerned

the testing of Hoover and Dirt Devil vacuum cleaners, which involved Goldsmith relaying purely technical results to Bissell. (Gold Mem. 8-9). Based on the undisputed facts, it is possible that during her years of work for Bissell, Goldsmith was exposed to confidential information that could be at least tangentially relevant to the vacuum cleaner testing at issue in this case. However, as explained below, that does not mean that Goldsmith would necessarily need to rely on such confidential information given the limited scope of her expert services in this case.

### 3. Relationship Between Expert Opinion and Confidential Information

Bissell contends that Goldsmith may rely on confidential information acquired from Bissell in performing expert services for Dyson in this case. In her own brief and in her declaration, Goldsmith has provided a thorough explanation regarding how she is able to offer expert services in this action for Dyson without relying on any confidential information gained from Bissell or running afoul of any of the promises she made to Bissell concerning confidentiality. To succeed on its motion, Bissell must offer more than general references to confidential information that Goldsmith has been exposed to over the last decade while doing work for Bissell.

Bissell identifies issues in its motion that have no bearing on Goldsmith's expert testimony in this case. For example, Bissell claims Goldsmith "entered into a confidential consulting relationship with BISSELL for purposes of this litigation," and that "[a]s part of that relationship, BISSELL's counsel discussed aspects of the case with [] Goldsmith and asked her to perform certain testing to assist BISSELL with its litigation strategy." (Mot. Disqu. G. 10). Bissell also theorizes that

Goldsmith may be giving "advice to Dyson on how best to challenge BISSELL's claims. . . ." (Mot. Disqu. G. 11). Dyson has shown that it hired Goldsmith to do independent testing, and that, as was customary, Goldsmith performed the testing in accordance with the instructions of Dyson, the client. (DE 180-1 Par. 8-10). Goldsmith explains in her declaration that "[w]hen clients retain IBR to conduct testing, the client specifies the testing standard, methods, and specification it wants IBR to use." (DE 180-1 Par. 9). Bissell makes a conclusory statement in its reply that Goldsmith made "litigation-testing decisions for Dyson," but Bissell cites no evidence to support its proposition. (Reply Disqu. G. 9). Bissell also theorizes that Goldsmith gave Dyson "advice on how best to challenge BISSELL's claims," but Bissell fails to point to any evidence that Goldsmith did so or was even hired for such a purpose. (Mot. Disqu. G. 11). Since there is no evidence that Goldsmith was hired to develop litigations strategies or to testify regarding litigation strategies as part of her proposed expert testimony, Goldsmith's knowledge regarding the parties' respective litigation strategies is not relevant. The court also notes that Goldsmith has vehemently asserted that she has fully complied with all confidentiality obligations she has to both Bissell and Dyson, and Bissell has offered no evidence to support its speculation to the contrary.

Dyson and Goldsmith have shown that IBR offers the only facility to properly conduct testing, that Goldsmith is a recognized independent expert who is hired throughout the vacuum cleaner industry, and that Goldsmith can offer unique expert services that are otherwise unavailable. (Gold. Decl. Par. 4-5). Under the facts of this case, Bissell's position, which is supported by non-controlling precedent, such as

*Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 590 (D. Minn. 1986), would effectively preclude an independent expert such as Goldsmith from operating in her field. *See Allstate Ins. Co.*, 840 F.Supp.2d at 1083 (stating that "'experts should be allowed to pursue their trade, and parties should be permitted to select their own experts'")(quoting *Chamberlain Grp., Inc. v. Interlogix, Inc.,* 2002 WL 653893, at *4 (N.D. Ill. 2002)). Although there may be instances where an expert that has provided prior services to an opponent should be disqualified based on that prior relationship, Bissell has not met its burden in this particular case to show that such a disqualification is warranted.

Bissell also argues that to allow Goldsmith to testify as an expert for Dyson would place her in an "adversarial relationship" with her past client. (Mot. Disqu. D. 11). However, the undisputed facts show that Bissell knew when it hired Goldsmith that Goldsmith had previously done work for Dyson, and yet Bissell had no qualms about Goldsmith acting in an adversarial relationship with Dyson when Bissell hired Goldsmith as a consultant in this case. Bissell's conjecture and speculation as to a potential connection between Bissell's confidential information and the opinions of Goldsmith in this action are not sufficient to support barring her as an expert in this case.

### 4. Equities

Dyson argues that the equities favor allowing Goldsmith to testify as an expert in this case. In considering whether to bar an expert that has previously performed services for the opposing party, the court should consider factors such as: (1) whether

the absence of the particular expert testimony will have a significant impact on the strength of the party's case, (2) whether the exclusion will have a substantial impact on the ability of the expert to pursue his or her profession, (3) whether the motion is being used as a means to harass the party instead of for legitimate purposes, and (4) whether the proposed expert services would be contrary to the agreement or understanding between the objecting party and the proposed expert. *See, e.g., Miller*, 2009 WL 3172151, at *2 (indicating that conflict of interest by an expert can be waived and indicating that "[t]he interest in protecting and preserving the integrity and fairness of judicial proceedings may be balanced with the expert's ability to pursue his profession and the party's ability to select his own expert"); *Commonwealth Ins. Co. v. Stone Container Corp.*, 178 F.Supp.2d 938, 943 (N.D. Ill. 2001)(indicating in regard to attorneys that motions to disqualify should be "viewed with extreme caution for they can be misused as techniques of harassment")(internal quotations omitted)(quoting *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 722 (7th Cir. 1982)).

Goldsmith contends that her expert services for Dyson in this case are not contrary to any understanding she previously had with Bissell when performing services for Bissell. The court first notes that although Bissell contends that Goldsmith performed certain services for Bissell relating to this case, the record does not reflect that Bissell ever listed Goldsmith as its expert in this case. The mere fact that Goldsmith may have provided consulting services for Bissell relating to this case prior to agreeing to serve as an expert for Dyson does not disqualify Goldsmith as an expert in this case. *Rosenthal Collins Group, LLC*, 2008 WL 4542948, at *1

(holding that an expert that had provided consulting services to the defendant relating to the litigation was not precluded from serving as an expert for the plaintiff). The record also reflects that Bissell and Goldsmith entered into a retainer agreement (Retainer Agreement) under which Goldsmith agreed to serve as a consultant for Bissell with respect to this case. The Retainer Agreement provides that the "[c]onfidential reports and other confidential documents generated, or obtained by [Goldsmith], in the course of [her] work on [the] matter will be the property of BISSELL. . . ." (Ret. Agr. 2). Dyson and Goldsmith indicate that Goldsmith will not use any confidential information derived from Bissell in performing expert services for Dyson in this case. As explained above, Bissell has not met its burden to show otherwise. In addition, Bissell and Goldsmith contemplated in the Retainer Agreement that Goldsmith would be able to perform work for Bissell's competitors. (Ret. Agr. 2). In the Retainer Agreement, Bissell agrees that Bissell "will not take any steps . . . to prevent IBR or [Goldsmith] from providing consulting and testing services to competitors of Bissell." (Ret. Agr. 2). Bissell attempts to make a distinction between consulting services and expert services, but it is reasonable to infer that consulting services would encompass expert services as well.

Further, even if a distinction could be drawn between consulting and expert services, Bissell has failed to show that Goldsmith is acting contrary to the terms of the Retainer Agreement. Bissell argues that it "never agreed that it would permit . . . Goldsmith to testify as to expert opinions against" Bissell. (Reply Disqu. G. 13). However, the restrictions relating to Bissell's confidential information were clearly included in the Retainer Agreement to protect Bissell's interests. If Bissell believed

that it was necessary to ensure that Goldsmith did not perform expert services for a competitor because she was exposed to Bissell's confidential information, it was incumbent upon Bissell to require such a term in the Retainer Agreement. Bissell could have required Goldsmith to agree to a more restrictive retainer agreement, which may have required additional consideration on Bissell's part or which could have prevented the parties from reaching an agreement. Based on Goldsmith's leading expertise in the vacuum cleaner industry, Bissell chose to retain Goldsmith notwithstanding the provision of the Retainer Agreement that allowed Goldsmith to work for Bissell's competitors. In seeking to bar Goldsmith from performing expert services in the instant action, Bissell is attempting to gain more of a benefit from the Retainer Agreement than Goldsmith agreed to provide. Goldsmith explains that it is precisely because she works for a broad range of clients in the vacuum cleaner industry that she requires that clients provide her with limited restrictions on future work, such as those found in the Retainer Agreement. Dyson, in fact, indicates that it has signed an agreement with Goldsmith with the same terms.

Dyson argues that Bissell is bringing the instant motion to obtain an unfair advantage. Bissell admits that it is willing to stipulate to the admission of the Testing by IBR, as long as Goldsmith does not testify at trial. (Mot. Disqu. G. 8). Dyson has also produced letters and emails showing that Bissell is willing to have the Testing admitted, but wants Goldsmith disqualified as an expert. (9/19/12 Let. 1); (10/8/12 Email 1). As Dyson correctly points out, the most qualified person, with the most knowledge of IBR's tests and the greatest ability to testify about the Testing, is Goldsmith. Bissell has not offered any adequate rationale for drawing a distinction

between the admission of the Testing itself and the admission of Goldsmith's testimony as an expert in this case. Dyson points out that Bissell has retained a rebuttal expert who Bissell intends to introduce at trial to attack the Testing done by IBR. Dyson also points out that if Goldsmith is not allowed to testify, Bissell will be able to use its own expert to attack the Testing, and Dyson will be without adequate recourse to oppose that attack at trial.

Dyson also questions Bissell's motivation for hiring Goldsmith to perform work in this case and the timing of such hiring. Dyson has shown that it was only after Goldsmith had already conducted testing that showed results adverse to Bissell's position that Bissell chose to hire Goldsmith as a consultant in this case. Dyson has also shown that in November 2011, when Bissell hired Goldsmith as a consultant regarding this case, Bissell should have been well aware that Goldsmith had already been performing work for Dyson relating to this litigation based upon the initial disclosures made by Dyson in April of 2011. Dyson correctly points out that Bissell is now conveniently using the consulting services performed for Bissell relating to this litigation, which were performed at Bissell's request, as a basis to exclude Goldsmith from testifying about the adverse tests. Goldsmith's expert services for Dyson should not have come as a surprise to Bissell, since Bissell itself had employed her for more than a decade based on her expertise, since Bissell was well aware that Goldsmith was an independent consultant who also worked for Bissell's competitors, and since Dyson made clear early in this case that it intended to rely on Goldsmith's testimony. Under Bissell's theory, all an alleged violator would have to do is employ a highly-specialized expert in the industry, an expert

who provides services by necessity to all companies in the industry, in order to bar

such an expert from testifying for its opponent relating to its own alleged violations.

Based on the above, it would be inequitable to disqualify Goldsmith from performing

expert services for Dyson in the instant action.

### B.  Timeliness of Motion

Dyson contends that Bissell did not timely raise its objection to Goldsmith

testifying as an expert for Dyson in this case.  As discussed above, it is undisputed

that Bissell was aware through its dealings with Goldsmith that she was a leading

expert in her field and that she performed work throughout the industry.  It is also

undisputed that in April 2011, Dyson disclosed to Bissell that IBR had conducted

tests for Dyson and that Dyson intended to rely on Goldsmith's testimony to support

its case.  (Dyson Init. Discl. 1-2).   Dyson represented that Goldsmith was the

Director of "IBR, an independent testing company," and that Goldsmith "is

knowledgeable about the testing of the Bissell vacuum cleaners at issue in this

litigation."  (Dyson Init. Discl. 1-2).  Thus, Dyson indicated that Goldsmith

possessed information that Dyson might use to support its claims.  (Dyson Init. Discl.

1-2).  At that point, Bissell had not itself hired Goldsmith as either a consultant or an

expert in this case, and Bissell should therefore have been aware that Dyson might

seek the expert testimony and services of Goldsmith to support Dyson's claims.  If

Bissell had such grave concerns as to Goldsmith's possession of Bissell's

confidential information, Bissell could have sought clarification regarding Dyson's

use of Goldsmith's services shortly after Dyson made its initial disclosures.  Yet,

Bissell did not make any such inquiry, and as a result, Bissell delayed in making any objection.

Bissell claims that it first learned that Goldsmith was going to be an expert for Dyson on August 31, 2013, when Bissell received Goldsmith's expert report. However, Dyson has shown that the expert report contained the same testing and information that Dyson had disclosed during discovery more than a year earlier through its initial disclosures and test results production. Bissell thus clearly acted in a dilatory fashion in seeking to bar Goldsmith as an expert. Bissell could have brought the instant motion at a much earlier point in this litigation, but instead waited until the summary judgment stage to do so. Granting Bissell's motion at this late juncture would effectively pull the rug from under Dyson, leaving Dyson without a key expert and causing unfair prejudice to Dyson. Therefore, based on the above, Bissell's motion to disqualify Goldsmith from serving as an expert is denied.

### III. 2010 Statements as to OS Vacuum Cleaners

Dyson and Bissell each move for summary judgment as to the 2010 Statements relating to the OS Vacuum Cleaners. To succeed on a false or deceptive advertising claim brought under the Lanham Act, a plaintiff must establish the following elements: "(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff

32

has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a loss of goodwill associated with its products." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 819-20 (7th Cir. 1999); *Muzikowski v. Paramount Pictures Corp.*, 477 F.3d 899, 907 (7th Cir. 2007)(explaining that "[i]n order to establish a claim of false or deceptive advertising under § 43(a) of the Lanham Act, a plaintiff must show that the defendant made a material false statement of fact in a commercial advertisement and that the false statement deceived or had the tendency to deceive a substantial segment of its audience").

Illinois Uniform Deceptive Trade Practices Act claims and Illinois unfair competition claims are generally resolved according to the same standard as Lanham Act claims. *See Neuros Co., Ltd. v. KTurbo, Inc.*, 698 F.3d 514, 523 (7th Cir. 2012)(explaining that the "Illinois Uniform Deceptive Trade Practices Act," is "a statute generally thought indistinguishable from the Lanham Act except of course in its geographical scope"); *All Star Championship Racing, Inc. v. O'Reilly Automotive Stores, Inc.*, 2013 WL 1701871, at *17 (C.D. Ill. 2013)(stating that "[b]ecause there is only one relevant element to the cause of action, it is not surprising that proof of a trademark infringement is sufficient to establish a violation of the Illinois Uniform Deceptive Trade Practices Act," and that "[c]laims for unfair competition and deceptive business practices brought under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act")(internal quotations omitted)(quoting *Pirelli Armstrong Tire Corp. v. Titan Tire Corp.,* 4 F.Supp.2d 794, 799 (C.D. Ill. 1998) and *Spex, Inc. v. Joy of Spex, Inc.,* 847 F.Supp. 567, 579 (N.D.

Ill. 1994)); *Central Mfg. Co. v. Brett*, 2005 WL 2445898, at *13 (N.D. Ill. 2005)(stating that "[c]laims brought under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.,* are resolved in the same manner as Lanham Act claims"). Illinois Consumer Fraud and Deceptive Trade Practices Act claims are likewise resolved according to the standard for Lanham Act claims except that for Illinois Consumer Fraud and Deceptive Trade Practices Act claims, a plaintiff must also prove that the defendant intended consumers to rely upon the deception. *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, 2000 WL 310304, at *7-8 (N.D. Ill. 2000)(stating that "[t]he elements of a claim under the Illinois Consumer Fraud Act are the same as those under the Lanham Act with the added element that the tortfeasor intend that consumers rely on the deception")(citing *Thacker v. Menard, Inc.*, 105 F.3d 382, 386 (7th Cir. 1997)).

### A. Falsity

To meet the falsity element for a false or deceptive advertising claim, "a plaintiff must show that the challenged advertisement is literally false, or, if literally true or ambiguous, that it is 'misleading in context, as demonstrated by actual customer confusion.'" *BASF Corp. v. Old World Trading Co., Inc.*, 41 F.3d 1081, 1089 (7th Cir. 1994)(quoting *Abbott Laboratories v. Mead Johnson & Co.,* 971 F.2d 6, 13 (7th Cir. 1992)); *Northern Star Industries, Inc. v. Douglas Dynamics LLC*, 848 F. Supp. 2d 934, 946 (E.D. Wis. 2012)(stating that "[t]he false statement necessary to establish a Lanham Act violation generally falls into one of two categories: (1)

commercial claims that are literally false as a factual matter; or (2) claims that may be literally true or ambiguous, but which implicitly convey a false impression, are misleading in context, or likely to deceive consumers"). To meet the falsity element "[w]here [the] defendant's ad explicitly *or implicitly* represents that tests or studies prove its product superior, plaintiff establishes its burden by showing that the tests did not establish the proposition for which they were cited." *BASF Corp.*, 41 F.3d at 1090 (emphasis added). It is undisputed that in the 2010 Statements regarding the OS Vacuum Cleaners, Bissell uses the term "HEPA," and refers to a specific numerical percentage of filtration, which as is explained above, indicates that a product meets certain specific filtration standards. (R DSF Par. 24). Such a representation by Bissell implicitly indicates that Bissell has some testing to support such a claim as to filtration performance.

### 1. Definition of HEPA

Dyson asserts that with respect to vacuum cleaners, the term "HEPA" means in the United States that a filter or filtration system has a minimum efficiency of 99.97% for 0.3 micron particles when tested at the application's rated air flow. (DSF Par. 12). Bissell disputes that the standard identified by Dyson is the only standard for filters and/or filtration systems used to define HEPA in the United States. However, Bissell fails to point to sufficient evidence to show that any other standard is appropriate under the facts in this case. (R DSF Par. 12). Bissell cites to a variety of evidence to support its position, but a review of such evidence shows that Bissell

has not cited to evidence that provides a valid basis for its position.

For example, in disputing Dyson's Statement of Fact Paragraph 12, Bissell cites to page 54 of the deposition of Kenneth M. Lee (Lee), who is an employee of Bissell. Lee referred in his deposition to an "EN" standard used in the vacuum industry that he stated is an "international standard." (Lee Dep. 54). Although Lee identified the EN standard as another standard, Lee did not state that the EN standard would have been the proper standard that applies in this case or that the HEPA standard proposed by Dyson is not the proper HEPA standard used in the United States. (Lee Dep. 54). Lee also refers to a U.S. Department of Energy (DOE) standard, but Lee does not explain why the DOE standard is the proper standard in this case. (Lee Dep. 54); (BSF Par. 4); (BSF Par. 6). In addition, the court notes that even if the court applied the EN standard or the DOE standard for the definition of HEPA in this case, Bissell has not shown that the 2010 Statements would be accurate under the EN or DOE standards in place in 2010. (B SJ Mem. 9-10).

Bissell also cites to pages 106-107 of the deposition of Joseph A. Fester (Fester), who is a product development engineer for Bissell. (DSF Par. 47; R DSF Par. 12). During Fester's deposition, Fester refused to specifically agree that the HEPA standard set forth by Dyson, which was referred to as the "IEST" standard, was the only relevant standard. (Fester Dep. 106-07). However, when asked whether "[t]he U.S. standard is generally considered to be the IEST," Fester did not dispute the point, and instead avoided answering the question by responding that "[t]he IEST is also an international standard." (Fester Dep. 107). As with Lee,

Fester also referenced the EN standard as another standard used to define HEPA. (Fester Dep. 107). When Fester was further pressed as to whether he could "think of any other standard that defines 'HEPA' differently than 99.97 percent efficiency of filtration of particles that are the size of .3 microns other than the EN" standard, Fester responded "No." (Fester Dep. 110).

Bissell also cites to Paragraphs 23 to 25 of the report of Jeffrey A. Siegel (Siegel), who is a technical expert retained by Bissell. (R SF Par. 12). Siegel states that the HEPA definition put forth by Dyson "is a common definition," but is "not the only definition." (Siegel Rept. Par. 25). Siegel gives a recitation of various standards that he believes qualify as HEPA standards and a recitation of prior standards used in 1998 and 2009. (Siegel Rept. Par. 23-25). However, Siegel fails to offer any specific information or explanation as to why the definition of HEPA set forth by Dyson is not the relevant definition with respect to the 2010 Statements. Therefore, based on the undisputed record, the proper definition for "HEPA" in the context of this case is a filter or filtration system that has a minimum efficiency of 99.97% for 0.3 micron particles when tested at the application's rated air flow.

## 2. Accuracy of 2010 Statements

Bissell admits that it did not base the 2010 Statements on any tests that were performed on the OS Vacuum Cleaners themselves. (R DSF Par. 44, 58). Bissell explains that it "does not dispute that it has no testing to show that the vacuums, as a whole, at issue in this litigation meet the HEPA standards for a HEPA system claim.

. . ." (R DSF Par. 58). However, Bissell contends that it based the 2010 Statements regarding the OS Vacuum Cleaners on certain tests conducted on the filters alone. Bissell indicates that it removed the filters from the OS Vacuum Cleaners (Filters) and tested them on a stand-alone basis (Stand-Alone Tests). (R DSF Par. 44). It is undisputed that "Bissell requested that" the Stand-Alone Tests be done at air flow rates that were less than the actual airflow rates created by the OS Vacuum Cleaners. (R DSF Par. 46). Bissell's own expert, Siegel, testified that "an unmodified ASTM F1977 whole vacuum filtration test, which is performed using the actual air flow of the vacuum, 'is reflective of the performance that the filter sees in the vacuum cleaner and therefore would be more representative of how the filter is actually going to perform in the vacuum when the vacuum is being operated.'" (R DSF Par. 49, 54). Siegel also testified that it is a "good idea" to use the "actual air flow rate of it application" in order to ascertain "the efficiency of that filter in its actual application." (R DSF Par. 54). Thus, it is undisputed that although Bissell made representations to consumers regarding the filtration performance of the OS Vacuum Cleaners, Bissell never actually tested the performance of the OS Vacuum Cleaners. Further, it is undisputed that Bissell separately tested the Filters at a lesser air flow rate than would have been normal in the OS Vacuums Cleaners. Thus, based upon the testimony of Bissell's own expert in this case, it is undisputed that even if the representations made by Bissell in the 2010 Statements were isolated to the Filters alone, Bissell still did not have adequate testing to support its claims.

In addition, Dyson commissioned its own Testing in this case. The results of

the Testing showed that when the Filters were tested separately at the airflow rates of the OS Vacuum Cleaners, the Filters themselves did not meet HEPA standards as professed by Bissell. (DSF Par. 66). Bissell fails to cite to evidence to refute such test results and create a genuinely disputed fact as to such tests. Instead, Bissell argues that such evidence is "not relevant or material to the issues in this case." (R DSF 66). However, the statements of Bissell's own expert contradict Bissell's assertions regarding the relevance of Dyson's tests. Further, Bissell's contention that Dyson's testing was performed at higher than the recommended air flow for such testing is not supported by the evidence cited by Bissell. (R DSAF 29); (BSAF Par. 29). Bissell cites only to paragraph 6 of Lee's declaration, which does not state such facts. (R DSAF 29); (BSAF Par. 29).

Bissell argues that it included the term "Media" in the 2010 Statements, and that such a term is understood in the industry to refer to the paper filter. Therefore, Bissell contends, the word "Media" notified consumers that the 2010 Statements related only to the filters and not the operation of the vacuum as a whole. However, the court must consider the context in which the 2010 Statements appeared. *See Scranton Gillette Communications, Inc. v. Dannhausen*, 1999 WL 558134, at \*1 (N.D. Ill. 1999)(stating that "[t]o determine whether a particular representation is literally false, it must be analyzed with its full context"). The undisputed facts in this case and the evidence presented by Dyson clearly show that Bissell used the 2010 Statements to advertise and sell vacuum cleaners, not filters. Thus, Bissell falsely represented to consumers in an unambiguous fashion that the OS Vacuum Cleaners

operated at a HEPA filtration level and that they captured 99.9% of certain allergens. Further, even if the court accepted Bissell's contention that the use of the term "Media" in the 2010 Statements clearly communicated a reference to the paper in the Filters, Dyson has still pointed to sufficient evidence to clearly establish that the 2010 Statements are literally false. (DSAF Par. 21-26). Based on the undisputed facts in this case, no reasonable trier of fact could conclude other than that the 2010 Statements relating to the OS Vacuum Cleaners are literally false.


### B. Materiality

Dyson argues that the court should find as a matter of law that the 2010 Statements relating to the OS Vacuum Cleaners were material to consumers. Although Bissell now contends that the 2010 Statements were not material, the undisputed facts concerning Bissell's course of conduct relating to the 2010 Statements, including Bissell's consumer research and the placement of the 2010 Statements on Bissell's website, products, and product packaging clearly shows that Bissell believed the 2010 Statements to be material to consumers. It is undisputed that Bissell commissioned consumer studies relating to the importance of respiratory health to better understand marketing possibilities. (R DSF Par. 87). The record show that studies ordered by Bissell itself showed that filtration efficiency was an important feature to consumers. (R DSF Par. 87). In addition, Bissell admits that the 2010 Statements appeared on the front packaging of certain OS Vacuum Cleaners, which is where Bissell highlighted the prominent selling features of its products. (R

DSF Par. 24, 72, 80, 81, 85-87).  Bissell also admits that the filtration performance of a vacuum is important to consumers.  (R DSF Par. 72, 80, 81, 85-87).  Mark Bissell, who works for Bissell, testified at his deposition that the filtration efficiency was one of the "key features that a customer [is] interested in . . . ."  (Bissell Dep. 159); (R DSF Par. 84).  Bissell also acknowledges that its representation concerning filtration related to respiratory health issues and that particles less than 2.5 microns in size can result in adverse health effects in humans if inhaled.  (R DSF Par. 14).  Based on the undisputed facts in this case, no reasonable trier of fact could find other than that the 2010 Statements were material to the consumers when deciding to purchase the OS Vacuum Cleaners.

### C.  Probable Injury to Dyson

Dyson argues that the court should find as a matter of law that Dyson suffered a probable injury as a result of the 2010 Statements.  Bissell contends that Dyson has not shown that it suffered an actual injury.  However, since Dyson does not seek its own lost profits as a remedy for its false or deceptive advertising claim, Dyson need only show that it suffered a probable injury.  *See B. Sanfield, Inc. v. Finlay Fine Jewelry Corp.*, 168 F.3d 967, 971 (7th Cir. 1999)(stating that the plaintiff must show that "the false or misleading statement . . . result[ed] in actual or probable injury to the plaintiff"); *Web Printing Controls Co., Inc. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205-06 (7th Cir. 1990)(indicating that a plaintiff can seek to recover for "actual injury, *i.e.,* a loss of sales, profits, or present value (goodwill)," but that "[o]ther

avenues of relief, however, are not foreclosed," such as "a recovery of defendant's profits," and that if "the plaintiff . . . [makes] other claims, claims not for damages (in the traditional sense) but for equitable relief such as a request for defendant's profits on an unjust enrichment theory," the plaintiff does not have to show "injury caused by actual customer confusion").

It is undisputed that Bissell is Dyson's number one competitor in the vacuum industry in terms of volume and dollar market share. (R DSF Par. 118). Dyson has also pointed to undisputed facts showing that Dyson Vacuum Cleaners are sold in many of the same retail establishments as the Bissell Vacuum Cleaners and often appear side-by-side with the Bissell Vacuum Cleaners. (DSF Par. 110, 111, 115, 116, 117). Based on the undisputed facts, the false statements regarding filtration in the 2010 Statements would have made the less-expensive Bissell Vacuum Cleaners more appealing to consumers than the more-expensive Dyson Vacuum Cleaners that advertised the same high filtration efficiency rates. (R DSF Par. 72, 80, 81, 85-87). Based on such facts, Dyson clearly suffered a probable injury. Based on the undisputed facts in this case, no reasonable trier of fact could find other than that Dyson suffered a probable and discernable competitive injury as a result of the false 2010 Statements. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 797 (5th Cir. 2011)(indicating that the injury must relate to the plaintiff's "ability to compete in the marketplace"); *Brosnan v. Tradeline Solutions, Inc.*, 681 F.Supp.2d 1094, 1099 (N.D. Cal. 2010)(indicating the injury must relate to the "plaintiff's ability to compete with the defendant"). Thus, Dyson's motion for partial summary

judgment is granted as it relates to the 2010 Statements, and Bissell motion for summary judgment is denied as to the 2010 Statements.

IV.  Post-2010 Statements as to OS Vacuum Cleaners

Bissell moves for summary judgment on the 2011 Statements and the 2012 Statements relating to the OS Vacuum Cleaners.  Dyson has not moved for summary judgment on the 2011 Statements and the 2012 Statements.  Bissell has failed to offer arguments indicating specifically why it is entitled to summary judgment on the 2011 Statements and 2012 Statements.  In its motion for summary judgment, Bissell argues as if there is only one set of statements made by Bissell that are at issue in this case.  In fact, Bissell fails to even acknowledge in its recitation of the facts in this case that after Dyson filed the instant action, Bissell amended its advertising.  (B SJ Mem. 1-6).  As indicated above, Bissell altered the 2010 Statements in 2011 and added the 2011 Disclaimer.  Bissell again revised its representations regarding filtration performance in 2012.  Bissell has not shown as a matter of law that the 2011 Statements or the 2012 Statements were not literally or impliedly false.  Dyson has pointed to adequate evidence, including its expert opinions, to support Dyson's position that the 2011 Statements and the 2012 Statements were false, and the ultimate determination on the issue will therefore be for the trier of fact.  Based on the above, Bissell's motion for summary judgment as to the 2011 Statements and the 2012 Statements is denied.

V.  Statements as to Healthy Home

Bissell moves for summary judgment on the advertising statements made with respect to the Healthy Home vacuum cleaner.  As indicated above, the Healthy Homes vacuum cleaner is the only closed-system vacuum cleaner that Dyson has included as part of its claims in this case.  It is undisputed that Bissell represented to consumers that the Healthy Home vacuum cleaner captured 100% of allergens.  (R DSF Par. 113).  Dyson contends that its expert has conducted testing on the Healthy Home vacuum cleaner, and that the representations made by Bissell concerning the vacuum cleaner are false.  (DSAF Par, 44); (R BSF Par. 22).  Although Bissell disputes the findings of Dyson's expert, Dyson has pointed to sufficient evidence to show that there are genuinely disputed issues of fact relating to the Healthy Home vacuum cleaner.  Therefore, Bissell's motion for summary judgment as it relates to the Healthy Home vacuum cleaner advertising statements is denied.


VI.  Affirmative Defenses

Bissell moves for summary judgment as to its affirmative defenses of release and laches.  Dyson moves for summary judgment as to all of Bissell's affirmative defenses, which are failure to state a claim, laches, statute of limitations, acquiescence, estoppel, and release.


A.  Defense of Release

Bissell argues that based upon a December 27, 2006 agreement between the

parties (2006 Agreement), summary judgment should be granted in Bissell's favor with respect to certain claims. Dyson argues that the 2006 Agreement does not cover any of the claims asserted by Dyson in this case. The 2006 Agreement provides that Illinois law governs, and the court will enforce the choice of law provision since it is reasonable. (R BSF Par. 75); (2006 Agr. Par. 6b); *see, e.g., Yassan v. J.P. Morgan Chase and Co.*, 708 F.3d 963, 973 (7th Cir. 2013). Under Illinois law, to successfully assert the affirmative defense of release, a defendant must show that the release is valid and that the release covers the claims at issue in the case. *See, e.g., Hampton v. Ford Motor Co.*, 561 F.3d 709, 714-17 (7th Cir. 2009). The court decides "the scope and effect of [a] release [based] on the intent of the parties," which the court determines "'from the language used and the *circumstances of the transaction.*'" *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co., Ltd.*, 707 F.3d 853, 863 (7th Cir. 2013)(emphasis in original)(citations omitted); *see also Hoseman v. Weinschneider*, 322 F.3d 468, 473-74 (7th Cir. 2003)(stating that "[u]nder Illinois law, '[a] release is a contract and, as such, is subject to the traditional rules of contract interpretation,'" and that "'[t]he intention of the parties, thus, controls the scope and effect of the release, and this intent is discerned from the release's express language as well as the circumstances surrounding the agreement'")(citations omitted). Where there is no ambiguity in the language of a release, "the question presented is one of law." *Id.* (citations omitted).

The 2006 Agreement contains a covenant not to sue (Covenant Not to Sue), which states: "[t]he parties covenant not to sue each other . . . for any and all actions,

causes of action, claims, debts, liabilities, accounts demands, damages, costs, expenses or fees whatsoever (jointly referenced as 'Claims') to the extent such Claims are based on facts, events, or circumstances that are (a) known by both parties as of the date of [the 2006 Agreement], or (b) reasonably could have been known or anticipated as of the date of [the 2006 Agreement]." (2006 Agr. Par. 2); (R DSF Par. 90). Bissell argues that the Covenant Not to Sue bars Dyson's claims with respect to the CleanView Helix, Rewind SmartClean, Lift-Off MultiCyclonic Pet, Pet Hair Eraser, Momentum, DigiPro Canister, and Healthy Home vacuum cleaners. However, Bissell concedes that the Covenant Not to Sue bars only those claims that Dyson knew of or reasonably could have known or anticipated in December of 2006. (B SJ Mem. 19). With the exception of the DigiPro Canister, the vacuum cleaners listed above did not exist in 2006 when the parties entered into the Covenant Not to Sue. Therefore, Dyson could not have reasonably known or anticipated its claims with respect to the CleanView Helix, Rewind SmartClean, Lift-Off MultiCyclonic Pet, Pet Hair Eraser, Momentum, and Healthy Home vacuum cleaners.

Bissell argues that prior to 2006, Dyson was making the same or substantially similar advertising claims with respect to predecessor models of such vacuums. However, Dyson could have no way of knowing which new products Bissell would introduce after the 2006 Agreement took effect. Under the reading of the Covenant Not to Sue advanced by Bissell, the Covenant Not to Sue would extend into perpetuity with respect to virtually any and all vacuum cleaners ever made by Bissell. Clearly, Dyson would not have agreed to such a proposition merely to secure the

expert testimony of one of Bissell's employees in another case.

With respect to the DigiPro Canister, the undisputed record reflects that Bissell began making "HEPA Media Filter" and "Captures 99.9%" advertising claims sometime in 2003, several years before the parties entered into the Covenant Not to Sue.  (R BSF Par. 9, 14, 26-27); (BSF Ex. 61 Par. 4-5); (R BSAF Par. 46). However, Dyson has set forth sufficient undisputed facts showing that Dyson would have had no way of knowing the specific filtration performances of Bissell's vacuums in 2006.  In addition, although covenants not to sue are generally enforced under Illinois law, "Illinois does not enforce contracts exculpating persons from the consequences of their wilful and wanton acts."  *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 252 (7th Cir. 1994).  With respect to the 2010 Statements, the undisputed facts show that Bissell's false advertising is wanton and willful.  Therefore, as a matter of law, the Covenant Not to Sue found in the 2006 Agreement does not apply to any of Dyson's claims in this case.

The court notes that Dyson has also argued that Bissell has waived application of the 2006 Agreement and that the 2006 Agreement was superceded and extinguished by a more recent agreement entered into between the parties on February 3, 2011 (2011 Agreement).  However, since the court has already determined that the 2006 Agreement does not cover the claims brought by Dyson in this case, the court need not consider Dyson's alternative arguments.  Based on all of the above, Dyson's motion for summary judgment as to the release affirmative defense is granted, and Bissell's motion for summary judgment as to the release affirmative defense is denied.

## B.  Defense of Acquiescence

For the defense of acquiescence, a plaintiff must establish that the plaintiff "conveyed its implied consent to" the conduct that is the basis for the plaintiff's claim. *Bunn-O-Matic Corp. v. Bunn Coffee Service, Inc.*, 88 F.Supp.2d 914, 925 (C.D. Ill. 2000); *see also Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 933 (7th Cir. 1984)(indicating that acquiescence is the "intentional abandonment" of a claim).  In the instant action, the undisputed facts show that the actions by Dyson in regard to prior models of Bissell vacuum cleaners did not convey any implied consent by Dyson to allow Bissell to engage in the false advertising at issue in this case, nor did they indicate an intentional abandonment by Dyson of it right to sue Bissell in relation to the false 2010 Statements.  The undisputed facts in this case clearly show that Dyson never condoned the conduct of Bissell that is at issue in this case.  Therefore, Dyson's motion for summary judgment as to the acquiescence affirmative defense is granted.


## C.  Defense of Estoppel

For an estoppel defense, a plaintiff must show: "(1) an act or misrepresentation made by the opposing party; (2) another party reasonably relies on the act or misrepresentation; and (3) the latter party thereby changes his position for the worse." *Persis Intern., Inc. v. Burgett, Inc.*, 2011 WL 4361544, at *3 (N.D. Ill. 2011).  The undisputed facts show that Dyson acted in a timely manner in raising its

48

claims in this case. Bissell has not pointed to sufficient evidence to indicate any express or implied misrepresentation by Dyson, in words or by conduct, upon which Bissell could have reasonably relied to its detriment. Therefore, Dyson's motion for summary judgment as to the estoppel affirmative defense is granted.

### D. Defense of Laches

For the defense of laches, the party asserting the defense must demonstrate: "(1) an unreasonable lack of diligence by the party against whom the defense is asserted and (2) prejudice arising therefrom." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999)(stating that the defense is raised to object to "delay in the pursuit of a right when a party must assert that right in order to benefit from it"). As indicated above, the undisputed facts show that Dyson did not have reason to be aware of the claims in this action prior to the creation of the specific models of Bissell Vacuum Cleaners at issue in this case. The undisputed facts show that when the 2010 Statements were made concerning the OS Vacuum Cleaners, Dyson promptly initiated its own testing to verify the accuracy of the statements, and that upon learning that the 2010 Statements were inaccurate, Dyson promptly initiated the instant action. Thus, the undisputed facts show that Dyson was diligent in pursuing the claims in the instant action. In addition, Bissell has failed to point to evidence to show that it suffered any prejudice as a result of any alleged delay on the part of Dyson. *See id.* (stating that "'[a] defendant has been prejudiced by a delay when the assertion of a claim available some time ago would be inequitable in light of the delay in bringing that claim . . . [and] ensues when a defendant has changed his

49

position in a way that would not have occurred if the plaintiff had not delayed'")(quoting *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2nd Cir. 1996)). Bissell makes vague references to incurring "marketing expenses," but Bissell fails to point to sufficient evidence to show that any specific expenses were connected to any delay on the part of Dyson. (B SJ Mem. 24); (R DSF Par. 135, 142). The court also notes that under Bissell's own version of facts, Bissell was able to sell OS Vacuum Cleaners for years before Dyson challenged the current models, which indicates, if anything, that Bissell may have profited from any delay on the part of Dyson. Bissell cannot seek to have the trier of fact speculate as to prejudice suffered by Bissell. Therefore, Dyson's motion for summary judgment as to the laches affirmative defense is granted, and Bissell's motion for summary judgment as to the laches affirmative defense is denied.

### E. Defense of Statute of Limitations

The Lanham Act does not specify a statute of limitations for a false or deceptive advertising claim. *Minuteman Intern., Inc. v. Critical-Vac Filtration Corp.*, 1997 WL 370204, at *9 (N.D. Ill. 1997). However, a court in determining whether such a claim is timely can look to analogous state law claims. *Id.* (stating since the Lanham Act does not have a "limitations period for claims alleging unfair competition or false advertising, and because there is no corresponding federal statute of limitations, [courts must] look to [and apply] 'the most appropriate' or 'the most analogous' state statute of limitations")(internal quotations omitted)(quoting *Conopco, Inc. v. Campbell Soup Company,* 95 F.3d 187, 191 (2d Cir. 1996)); *Logan*

*Farms v. HBH, Inc. DE*, 282 F.Supp.2d 776, 789 (S.D.Ohio 2003)(stating that "the Lanham Act does not prescribe a limitations period for bringing claims," but that "courts refer to the statute of limitations on analogous state law claims"). There is a three year statute of limitations period for Illinois Uniform Deceptive Trade Practices Act claims, Illinois Consumer Fraud and Deceptive Trade Practices Act claims, and Illinois common law unfair competition claims. *Chattanoga Mfg., Inc. v. Nike, Inc.*, 301 F.3d 789, 793 (7th Cir. 2002); *Persis Intern., Inc. v. Burgett, Inc.*, 2012 WL 4176877, at *3 (N.D. Ill. 2012). As indicated above in regard to the laches defense, the undisputed facts show that Dyson acted promptly when it knew or should have known of its claims in this case. The undisputed facts show that Dyson brought its claims within all pertinent statute of limitations periods. Therefore, Dyson's motion for summary judgment as to the statute of limitations affirmative defense is granted.

### F. Defense of Failure to State a Claim

In regard to the failure to state a claim defense, Bissell filed an answer to the complaint and did not move to dismiss any claims in the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). Dyson pled sufficient facts in its complaint to state a valid claim for relief with respect to all the claims bought in the complaint. Therefore, Dyson's motion for summary judgment as to the failure to state a claim affirmative defense is granted.

## CONCLUSION

Based on the foregoing analysis, Dyson's partial motion for summary judgment is granted in its entirety and Bissell's motions are denied in their entirety.


_____
Samuel Der-Yeghiayan
United States District Court Judge


Dated:   June 14, 2013